UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| CHRISTOPHER R. WALSH | ) | |
| | ) | |
| V. | ) | NO. 2:16-CV-42 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's application for Supplemental Security Income ["SSI"] under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. Plaintiff had also filed an application for Disability Insurance Benefits. However, at the hearing plaintiff amended his disability onset date from January 1, 2008 to January 13, 2013, due to the fact that the ALJ pointed out that the record indicated that the plaintiff was working up to 50 hours per week until January 12, 2013. At that point, the plaintiff withdrew his claim for Disability Insurance Benefits. The resulting hearing decision by the ALJ, and this judicial review of that decision, only involve his SSI claim.

Plaintiff was represented at the administrative hearing and through the review by the Appeals Counsel. However, at some point and for some reason, he undertook to represent himself prior to his filing of this lawsuit. On August 3, 2016, this Court set a briefing schedule in accordance with the Local Rules of this Court [Doc. 10]. Plaintiff was required to file his dispositive motion within 45 days of August 3, 2016, with the

Commissioner filing a dispositive motion responding to the plaintiff's motion. The order also states at paragraph (2)(a) that "[i]f the plaintiff fails to file a motion and brief as required (by paragraph (1) of the order), the Commissioner shall file her dispositive motion and accompanying brief within 90 days of the date this order is filed and, in that event, the plaintiff will have forfeited the right to file any brief thereafter." Plaintiff declined to file a dispositive motion. The defendant Commissioner filed a Motion for Summary Judgment [Doc. 12] in accordance with the order, and the matter is now ripe for judicial review.

## I. Standard of Review

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of

the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

## II.  Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

3

### III.  Plaintiff's Vocational Characteristics

Plaintiff was, and remains, a "younger" individual under the applicable Social Security regulations.  He has a high school education.  There is no dispute that he cannot perform his past relevant work.

### IV.  Evidence in the Record

Plaintiff's medical records and his hearing testimony are summarized in the Commissioner's brief as follows:

> Plaintiff reported a history of seizures beginning in 2000 but increasing in severity around 2006 or 2007 (Tr. 574-75). Valeria Sawicki, ARNP, a nurse practitioner, treated Plaintiff over a number of years through several practices (Tr. 429). His seizures responded well to medication (Tr. 418-29). Testing in June 2009 was normal, including a normal electroencephalogram (EEG) (Tr. 432), and a magnetic resonance imaging (MRI) brain scan that showed no acute findings (Tr. 434). The doctors noted that the normal findings did not rule out seizure activity (Tr. 432). In November 2010, Plaintiff reported four major seizures per year (Tr. 458-60). An EEG at that time was normal (Tr. 460). In January 2011, Jack Scariano, M.D., Plaintiff's treating neurologist, noted a long-term video monitored EEG was normal but stated that these results did not rule-out seizure activity (Tr. 467).
> For the next two years, Dr. Scariano continued to treat Plaintiff's seizures with Lamictal, an anti-convulsant (Tr. 266). He also prescribed Xanax for Plaintiff's reported social anxiety (Tr. 266). Plaintiff told Dr. Scariano in April 2012 that he had not experienced any seizures, which he thought were caused by anxiety and also epilepsy (Tr. 271). Dr. Scariano noted that Plaintiff's seizures and pseudo seizures were controlled with medication (Tr. 271).  In July 2012, Plaintiff reported that he had no more seizures; his medications helped and he was doing well (Tr. 270). The doctor again noted medications controlled the seizures and anxiety (Tr. 270).
> In September 2012, Plaintiff went to the emergency room following a seizure (Tr. 297). He stated that it had happened at Lowe's hardware store and had been stress-induced by work pressures (Tr. 297). In October 2012, Plaintiff told Dr. Scariano he was doing better on his medication, had not had any further seizures, and had no side effects from his medications (Tr. 269). His neurologic examination was normal (Tr. 269). Once again, Dr. Scariano assessed that Plaintiff's seizures and anxiety were controlled with medication (Tr. 269).
> At his follow-up in early January 2013, Dr. Scariano discharged Plaintiff due to a failed urine drug screen that was positive for THC (marijuana) (Tr. 268).

4

He wrote that Plaintiff had been seen infrequently in the office for a history of seizures that had been well-controlled with medication (Tr. 268). He stated, however, that Plaintiff was not consistent in taking the prescribed anti-convulsant medication (Tr. 268).

That Saturday (January 12, 2013), Plaintiff arrived to the emergency room by ambulance following a motor vehicle accident (Tr. 278). He reported that he had been the driver of the car, which had been impacted on the front end while traveling at moderate speed (Tr. 280). He complained of low back pain and a laceration to the forehead (Tr. 278). A computed tomography (CT) scan of the lumbar spine revealed an acute burst fracture at L3 with involvement of the posterior elements and displacement of fracture fragments (Tr. 285). X-rays of his back showed similar findings (Tr. 287). The CT scan of Plaintiff's brain was stable and unremarkable (Tr. 290). Plaintiff was transferred to University of Tennessee Medical Center for further care (Tr. 280).

The next day, William Oros, M.D., an orthopedist, noted Plaintiff's thoracolumbar spine was tender, but his physical examination was otherwise normal (Tr. 361). Plaintiff had been placed into a TLSO brace and standing x-rays with the brace showed good alignment and position of the fracture (Tr. 361, 363). Dr. Oros planned to treat Plaintiff non-operatively with the brace, with a follow-up evaluation in 10 to 12 days (Tr. 361).

At the follow-up later that month, Plaintiff was wearing the TLSO brace, reported doing well, and had no new issues (Tr. 373). Physical examination showed Plaintiff to be neurovascularly intact in both lower extremities. He walked with nonantalgic heel-to-toe gait, and he had symmetric deep tendon reflexes (Tr. 373). Radiographs of the lumbar spine showed good, aligned position of the fracture without displacement (Tr. 373). Dr. Oros opined that clinically, Plaintiff looked good (Tr. 373). He instructed Plaintiff to return in four weeks (Tr. 373).

The next month, Plaintiff told Dr. Oros that his hip had started bothering him a little bit as he increased his activity (Tr. 373). He also reported additional discomfort in his back, but Dr. Oros noted Plaintiff had also decreased the amount of narcotics he was taking (Tr. 374). Upon physical examination, Plaintiff was neurovascularly intact in both the lower extremities (Tr. 374). He had symmetric deep tendon reflexes and walked with a nonantalgic gait (Tr. 374). His hip was tender to palpation over his greater trochanter, but his range of motion was otherwise non-tender (Tr. 374). X-rays showed good alignment and position of his fracture without displacement and no significant pathology in his pelvis (Tr. 374). Dr. Oros told Plaintiff that he thought his back and hip would continue to get better on their own (Tr. 374). He instructed Plaintiff to increase his activity as tolerated but not to lift anything heavier than a gallon of milk (about 8 pounds) (Tr. 374). He told Plaintiff to return in a month (Tr. 374).

In early March 2013, Plaintiff saw Sam Kabbani, M.D., on referral from Dr. Scariano (Tr. 574-75). Dr. Kabbani noted Plaintiff's failed drug screen for marijuana, as well as his history of seizures/pseudo seizures and social anxiety (Tr. 574). His last known seizure was two months earlier (Tr. 574). Plaintiff

5

reported decreased memory, especially short-term memory (Tr. 574). He stated that he had not taken his prescribed anticonvulsant for seven months and was "not going to" (Tr. 574). His medications included Flexeril and hydrocodone for his back and Xanax for his anxiety (Tr. 574). Dr. Kabbani wrote that Plaintiff refused all treatment; he would not accept a "seizure letter" that explained seizure precautions, symptoms, and situations that may accept seizures (Tr. 574-75). He refused additional EEG testing or a behavioral management referral (Tr. 574-75). He did not want any seizure medication or a return appointment (Tr. 575). Dr. Kabbani declined to refill Plaintiff's Xanax prescription (Tr. 575).

At the end of March 2013, at his three-month follow-up after his accident, Plaintiff told Dr. Oros he was doing well with no new complaints (Tr. 375). On physical examination, Plaintiff had minimal paraspinal muscle spasm but was neurovascularly intact in both lower extremities and walked with a nonantalgic heel-toe gait (Tr. 375). X-rays showed no change in his fractures, with consolidation healing (Tr. 375). Clinically, Plaintiff was doing better (Tr. 375). Dr. Oros told Plaintiff to decrease using the back brace over the next two weeks (Tr. 375). He did not give Plaintiff any lifting or activity restrictions at that time (Tr. 375).

At the beginning of May 2013, Plaintiff went to the emergency room following a seizure (Tr. 533-35). His seizure had been witnessed by a co-worker (Tr. 533). He was not taking any medications for seizures and had not recently seen a physician (Tr. 533).

A few days later, in early May 2013, Roy Nevils, Ph.D., clinical psychologist, performed a psychological consultative examination of Plaintiff at the request of the agency (Tr. 389-92). Plaintiff told Dr. Nevils that he could not work due to self-diagnosed stress-induced pseudo seizures and social anxiety disorder (Tr. 389). Plaintiff stated that he had "parted ways" with his neurologist (Dr. Scariano) because he did not believe in pseudo seizures and wanted him to take his medication as prescribed, but he had done his own research and did not want to follow the doctor's instructions (Tr. 389-90). He had never been had any mental health treatment (Tr. 390). Plaintiff told Dr. Nevils that prior to his back injury in January 2013, he had been working "50 hours a week" in his own log home business (Tr. 390). He stated he was currently "lucky to get 30, 35 (hours a week)" of work with all of his medical appointments (Tr. 390). He reported four seizures in the past nine days, but also stated he was not on any medication (Tr. 390). He would take over-the-counter vitamins each day (Tr. 390-91). He had lived with his girlfriend for more than 15 years, and they had two children (Tr. 390). She stayed at home and he supported his family with his employment and with TennCare (Tennessee's Medicaid program) (Tr. 389-90).

In describing his daily activities, Plaintiff stated he mowed the yard and did his own laundry (Tr. 391). His food preparation was limited to sandwiches and cereal (Tr. 391). Recreational activities included "his children," watching television news, reading golfing magazines, and fishing when he had the time or opportunity (Tr. 391). When asked about exercise, he stated that his job was

6

"plenty of exercise" (Tr. 391). He told Dr. Nevils that in addition to seeing his wife and children each day, and co-workers, he occasionally visited with neighbors and occasionally talked with his sister over the phone (Tr. 391).

Dr. Nevils observed that Plaintiff displayed adequate appearance and personal hygiene with no obvious physical impairment or discomfort (Tr. 391). He was overtly calm and quite pleasant in manner (Tr. 391). His mental status examination was unremarkable, with entirely normal findings (Tr. 391). Dr. Nevils diagnosed social anxiety disorder and noted that Plaintiff's reported difficulties with social anxiety caused only mild interpersonal relationship disturbance in that he would avoid crowds of people (Tr. 391). He opined that he saw no limitations with respect to memory, concentration, or adaptability (Tr. 391).

On May 15, 2013, at the initial level of review, State agency psychological consultant Rebecca Hansmann, Psy.D., evaluated Plaintiff's reported anxiety under Listing 12.06 and found that it resulted in no restriction in activities of daily living; mild difficulties in social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. 46-48). She gave great weight to Dr. Nevils's opinion, and found that the record did not support additional limitations (Tr. 47-48). As Plaintiff had no more than mild limitations, she found that he had no severe mental impairment (Tr. 47).

In mid-May 2013, Plaintiff sought physical therapy on referral from Dr. Oros (Tr. 468). He reported only minimal difficulty with activities of daily living, walking, sitting, standing (Tr. 468). The therapist's plan included daily home exercises and physical therapy three times a week for four weeks for a total of twelve visits (Tr. 470).

Later that month, on May 22, 2013, David McConnell, M.D., performed a physical consultative examination of Plaintiff at the agency's request (Tr. 395-97). Plaintiff stated he was disabled due to chronic low back pain and seizures (Tr. 395). He never had any back surgery (Tr. 395). He was attending physical therapy, but he was no longer under the care of a physician (Tr. 395). He told Dr. McConnell he had self-diagnosed stress-induced "pseudo seizures" and had experienced 32 grand mal seizures in the past 2 months (Tr. 395). He did not drive and complained of being depressed (Tr. 395). On physical examination, Dr. McConnell observed that Plaintiff was muscular, had a deep suntan, and did not use any assistive device (Tr. 396). He had motor strength in both upper extremities of 4/5 (Tr. 396). His musculoskeletal examination showed supine straight leg raise testing positive bilaterally at 45 degrees; sitting straight leg raise testing was negative bilaterally (Tr. 396). Examination of Plaintiff's ankles, knees, hips, thoracic spine, elbows, wrists, shoulders, cervical spine, and digits of the hand all had full range of motion without pain (Tr. 396). Gait and station were normal and Plaintiff could heel-toe and tandem walk and balance on one leg (Tr. 396). Plaintiff declined Dr. McConnell's request for an x-ray of his lumbar spine (Tr. 396). Dr. McConnell assessed chronic low back pain, a history of seizure

7

disorder, and depression (Tr. 397). He opined that during an 8-hour workday, Plaintiff could lift and carry 35 pounds occasionally and 30 pounds frequently (including upward pulling); stand and walk for at least 7 hours (with normal breaks); and sit for at least 8 hours (with normal breaks) (Tr. 397).

On June 6, 2013, also at the initial level of review, State agency medical consultant Denise Bell, M.D., opined that during an 8-hour workday, Plaintiff could perform a range of medium work in that he could lift and carry 50 pounds occasionally and 25 pounds frequently and sit, stand, and walk for more than 6 hours (Tr. 49). As for environmental limitations, he was to avoid all exposure to hazards (machinery, heights, etc.) (Tr. 50).

Despite being prescribed twelve visits of physical therapy, Plaintiff only returned twice more, once on May 28 and then on June 10 (Tr. 472-76). He was discharged on August 8, 2013 due to non-compliance (Tr. 478-79). He stated he was not able to attend physical therapy appointments due to "transportation issues and work conflicts" (Tr. 478).

Plaintiff went to the emergency room in July and August 2013 following seizures (Tr. 506- 26). He was treated for injuries sustained during the seizures and was discharged (Tr. 506-26).

In September 2013, at the reconsideration level of review, State agency psychological consultant Jeffrey Wright, Ph.D., affirmed the findings and conclusions of Dr. Hansmann at the initial level (Tr. 89-90). That same day, State agency medical consultant Kanika Chaudhuri, M.D., affirmed the RFC assessed by Dr. Bell at the initial level (Tr. 91-94).

In October 2013, Plaintiff went to the emergency room with right shoulder pain following a seizure (Tr. 501-03). The doctor instructed him to wear a sling for a week (Tr. 504).

In February 2014, Plaintiff went to the emergency room after he had a seizure and sustained a laceration to his left eyebrow and a sore right pelvis (Tr. 491-92). His physical examination was normal, with full pain-free range of motion, normal motor strength, intact sensory examination, and normal gait (Tr. 492-93). His neurological examination was normal (Tr. 493). A CT scan of Plaintiff's brain showed mild frontal soft tissue swelling but no acute intracranial abnormalities (Tr. 497). A scan of his cervical spine showed a mild disc bulge on the right at C5-C6-C7, but no acute abnormalities (Tr. 498). An x-ray of his pelvis showed no acute bony abnormalities (Tr. 499). The doctor stitched Plaintiff's laceration and discharged him after additional neurological examinations were normal (Tr. 493-94).

In April 2014, Plaintiff went to emergency room after falling on his elbow, but "[a]t their worst the symptoms were very mild" (Tr. 481). He was not taking any medications and had not recently seen a physician (Tr. 481). His physical examination was normal, except for swelling and tenderness in the left elbow (Tr. 482). An x-ray of his left elbow was normal (Tr. 485). The nurse splinted his elbow, gave him an ice pack, and discharged him (Tr. 482).

At his administrative hearing on August 1, 2014, Plaintiff testified that he

8

stopped working in January 2013, when he "broke [his] back" (Tr. 29). He stated he was involved in a 2013 car accident that burst his L3-L4 (Tr. 31). He been driving at the time of his accident, but he let his license expire after talking to his neurologist (Tr. 31). He also stated that he stopped working due to seizures, which began in 2001 or 2002, and occurred "repetitiously" until 2007 (Tr. 30). When he had a seizure, the convulsions impacted his back (Tr. 31). He had been prescribed an anti-convulsant, but stated it did not help his seizures (Tr. 31-32). Stress triggered his seizures, the most recent of which had been the month prior (Tr. 32-33). He testified that he had been on so many seizure medications for the last decade that he "chose a different route" and took over-the- counter vitamins for his seizures, which helped (Tr. 34). He stated he had last used marijuana in late 2011/early 2012 (Tr. 34). He argued that the information on when and why he was released from his neurologist's care (in January 2013 due to marijuana use) was incorrect, but had no other explanation (Tr. 34-35).

[Doc. 13, pgs. 3-11].

At the administrative hearing, the ALJ took the testimony of Dr. Robert Spangler, a vocational expert ["VE"]. Dr. Spangler, after identifying and classifying plaintiff's past relevant work, was asked a series of hypothetical questions. One of them, and the one upon which the ALJ based his ultimate decision, was for the VE to assume a person with plaintiff's vocational characteristics who could perform light work with frequent postural changes; no use of ropes, ladders or scaffolds; who must avoid concentrated exposure to vibrations, and any exposure to hazards; and who was limited to simple, unskilled work. When asked if there were jobs such a person could perform, the VE identified a significant number of jobs in both the State and nation which such a person could perform [Tr. 37-38].

## V.  ALJ's Findings

On September 10, 2014, the ALJ rendered his hearing decision. He initially addressed the decision by plaintiff to amend the disability onset date to a date after the

9

expiration of plaintiff's insure status, resulting in withdrawal of the disability insurance claim (Tr. 11).  After then describing the sequential evaluation process involved, he made the following findings:

1. That the plaintiff had not engaged in substantial gainful activity since his amended onset date of January 13, 2013 (Tr. 13).

2. The ALJ found next that the plaintiff had severe impairments of a spine disorder, a history of seizures and an anxiety disorder (Tr. 13).  The ALJ noted that these were the only medically determinable impairments asserted by plaintiff, and that the record revealed no others (Tr. 14).

3. The ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 2.  In making this finding the ALJ found that the plaintiff, from a mental perspective, had a mild restriction in activities of daily living and social functioning, and a moderate restriction in maintaining concentration, persistence or pace.  Thus, the requirements of "paragraph B" of the various mental health listings were not satisfied (Tr. 14-15).

4. The ALJ found that the plaintiff has the residual functional capacity ["RFC"] to perform light work, with frequent postural activities, but with no climbing of ropes, ladders or scaffolds; with no exposure to hazards; and with a limitation for simple unskilled work (Tr. 15).  In conjunction with this finding, the ALJ thoroughly discussed the evidence relating to each of the plaintiff's severe impairments (Tr. 16-17).  He

10

explained that he did not find the plaintiff to be completely credible to the extent he claimed his symptoms would preclude performance of the RFC found by the ALJ (Tr. 18).

5. The ALJ found that the plaintiff could not perform any of his past relevant work (Tr. 19).

6. The ALJ found that with plaintiff's vocational characteristics and RFC, he would not be disabled under the Medical-Vocational Guidelines [the "Grid"] if he could perform a full range of light work. Since he cannot perform a full range of light work, the ALJ considered the testimony of the VE, and found that the plaintiff could still perform a substantial number of jobs in the national and state economies (Tr. 19). Accordingly, the ALJ found that the plaintiff was not disabled (Tr. 19-21).

## VI. Analysis

Without the benefit of any sort of brief from the plaintiff, the Court has read the plaintiff's complaint. As he did throughout the record, the plaintiff points out that he suffers from very severe seizures. He asserts that due to that condition he cannot drive or work. He asserts that his application for benefits was denied because he has a physical build and a deep suntan. [Doc. 2, pg. 1]. He describes his broken back from the car wreck and a separated shoulder. He asserts that he has had "over 250 seizures since 2007." *Id.* at 2. He states that "the vocational doctor's board," presumably the VE, "said I qualified for zero jobs." *Id.* He says that "I have the documentation from doctors saying I'm disabled…," and that he does not understand how the ALJ found that he was

11

not. *Id*.

To translate the plaintiff's assertions into Social Security terms, plaintiff is arguing that the ALJ's decision was not supported by substantial evidence. It also appears that since he cannot return to the job he held before his car wreck, he is disabled. The Court therefore must follow the ALJ's reasoning through the sequential evaluation process, see if his findings were supported by substantial evidence, and determine if his finding that plaintiff can perform a significant number of other jobs comports with the law and the evidence.

There is no dispute that, at step one, the plaintiff has not engaged in substantial gainful activity since he last performed a full time job the day before his automobile accident on January 12, 2013. Under the facts of this case, that is his disability onset date. It is likewise true that his insured status expired June 30, 2011. That means it is legally impossible for him to seek Disability Insurance benefits. Of course, the sequential process must continue with respect to his application for Supplemental Security Income benefits.

There is also no justifiable issue with respect to the ALJ's step two finding that he has severe impairments of a spine disorder from the car wreck, a history of seizures, and an anxiety disorder. These were all of the impairments the plaintiff claims to have, and all the impairments supported by the evidence.

At step three, there is nothing in the record to indicate that the plaintiff's conditions meet or equal any of the physical or mental impairments in 20 CFR, Part 404,

12

subpart P, appendix 1.  Particularly, with respect to the mental listings, Dr. Nevils' opinion following his consultative examination of the plaintiff (Tr. 391) constitutes substantial evidence to support the ALJ's findings of mild limitations in social functioning and activities of daily living and a moderate limitation in concentration, persistence or pace.  The Court would point out that the ALJ actually gave some weight to plaintiff's testimony in finding the moderate limitation.   The ALJ gave an appropriate explanation for his findings in each of these areas.

There is also substantial evidence to support the ALJ's step three finding regarding the plaintiff's residual functional capacity ("RFC").  The RFC, which is the most a plaintiff can still do in spite of the physical and mental limitations resulting from his impairments, is perhaps the key finding reserved to the ALJ.  20 CFR § 416.945(a).  However, this crucial determination must be supported by substantial evidence. It appears to the Court that the consultative examinations and the rest of the medical record as set out hereinabove provide strong evidentiary support for the RFC finding.  It accommodates the restrictions imposed by all of the examining and non-examining sources.

Of course, the legitimacy of the RFC finding is dependent upon an accurate assessment by the ALJ of the plaintiff's subjective complaints.  The ALJ described the two step process he is required to follow in this regard.  First, he must determine whether there is a physical or mental impairment shown by medically acceptable techniques which could produce the plaintiff's symptoms.  The plaintiff was found to have such

13

impairments. Then, however, the ALJ has the duty to determine how severely they impact the plaintiff's ability to perform work-related activities. If the plaintiff's subjective complaints relating to the claimed degree of loss of function are not in line with the medical evidence, the ALJ must determine from the entire record whether the plaintiff's subjective complaints are accurate descriptions of that loss of function [Tr. 15-16]. This fact finding responsibility of the ALJ, if supported by evidence cited in the hearing decision, and if the proper regulatory procedures are followed, is virtually "unchallengeable." *See, Ritchie v. Comm'r of Soc. Sec.*, 540 Fed. App'x 508, 511 (6th Cir. 2013), *and, Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709- 713-14 (6th Cir. 2012).

Here, the ALJ accurately discussed and summarized all of the medical findings and treatment history relative to plaintiff's back disorder (Tr. 16), seizures (Tr. 16-17), and anxiety (Tr. 17). He noted that he had accounted for all justifiable limitations in his RFC finding. Based upon that evidence, which showed marked improvement with conservative treatment and medication, and as to which the physical and mental effects were summarized in the findings and opinions of the consultative examiners, he found that the plaintiff was not completely credible (Tr. 18). In his complaint, plaintiff asserts that his application "was denied due to a physical build & deep suntan." It is true that Dr. McConnell, the consultative examining physician, described the plaintiff as muscular with a "deep sun tan" (Tr. 396). However, Dr. McConnell noted far more than the plaintiff's outward appearance. He detailed the aspects of movement in which the plaintiff exhibited a limited range of motion, as well as those where plaintiff showed a

14

normal range of motion and lack of pain.  He noted that plaintiff's gait and station appeared normal.  To better evaluate the plaintiff's complaints of lumbar pain, Dr. McConnell requested to be allowed to take an x-ray of that area, which plaintiff refused to allow.  In any event, as the ALJ explained in his discussion of the medical records, far more went into the RFC and credibility findings than plaintiff's outward physical appearance.

After reviewing the ALJ's decision and the records upon which it was based, the Court finds that there was ample substantial evidentiary support for all of the findings in this case.  The ALJ appears to have complied with all relevant Social Security Rulings and the applicable regulations in arriving at his ultimate decision that the plaintiff is not disabled.  Accordingly, it is respectfully recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[1]

Respectfully submitted,

s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).

15